*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 11a0303p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

KIA MAXWELL, individually and as Next
Friend of T.D., a minor, and B.R., a minor,
                                    *Plaintiff-Appellant*,

          *v.*

DARREN DODD, JAY DONALDSON, ROGER
GONGOS, MATTHEW GUNNARSON, JAMES
KNIGHT, and GREGORY LASKI,
                                    *Defendants-Appellees*.

Nos. 09-2538; 10-1663

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 08-11326—Patrick J. Duggan, District Judge.

Decided and Filed: December 6, 2011

Before: NORRIS, SUTTON and GRIFFIN, Circuit Judges.

_____

**COUNSEL**

**ON BRIEF:** William L. Woodard, ASSISTANT UNITED STATES ATTORNEY,
Detroit, Michigan, for Appellees. Kia Maxwell, Sterling Heights, Michigan, pro se.

_____

**OPINION**

_____

SUTTON, Circuit Judge. Angered by an aggressive search of her home by federal agents, Kia Maxwell filed several *Bivens* claims and a § 1985 civil-conspiracy claim against the agents. The claims went to a jury, and Maxwell won some and lost some. Maxwell challenges some components of the verdict and a few of the district court's rulings. We affirm.

1

I.

On October 18, 2007, two Secret Service agents staked out Kia Maxwell's home in Sterling Heights, Michigan, hoping to execute an arrest warrant for Bryan Ross, Maxwell's boyfriend. The agents saw Ross's car arrive at Maxwell's house and notified Agent Darren Dodd, the case agent assigned to investigate Ross. Dodd went to the house and saw Ross outside. When Ross recognized Dodd, he quickly went inside. Dodd assembled other agents and two officers from the Sterling Heights Police Department at a nearby parking lot to discuss how to make the arrest.

After returning to Maxwell's house, some of the agents took up perimeter positions while the others knocked on the front door. When Ross answered the door, an agent detained him on the front porch, handcuffed him, patted him down and escorted him to a Secret Service vehicle. At roughly the same time, five other agents entered the house and conducted a protective search of it. They did not have a search warrant. The agents found two people in the home—Kia Maxwell, who was visibly pregnant, and her sister, Tyra Maxwell. The agents eventually conducted a more extensive search in the presence of the two sisters. They claim Kia Maxwell consented to the search, while she claims she did not. The agents seized a 12-gauge shotgun, some .40 caliber ammunition and (according to Maxwell) $9,600 in cash.

Maxwell alleges that the officers refused to let her use the bathroom during their search, forcing her to urinate on herself. She claims that Dodd and Knight pushed and pulled her from room to room during the search, that they used racial epithets against her (Maxwell and her sister are African-American) and that they threatened to arrest her. The agents deny all of these accusations.

Maxwell sued the five officers who conducted the search—Darren Dodd, Roger Gongos, Matthew Gunnarson, James Knight and Gregory Laski—claiming they violated her Fourth Amendment rights in a variety of ways. She also claimed that the agents conspired to violate her civil rights in violation of 42 U.S.C. § 1985(3). Before trial, the district court dismissed Maxwell's civil-conspiracy claim against all of the agents except Dodd and Knight. After hearing the evidence at trial, the district court granted judgment

as a matter of law to Dodd and Knight on the civil-conspiracy claim and to Gunnarson on the illegal-entry claim. The jury returned a verdict in favor of the agents on Maxwell's illegal-entry claim, but in favor of Maxwell on her claims of unlawful search without consent, wrongful taking into custody and wrongful seizure of property. The jury awarded Maxwell $1000 in compensatory damages ($500 each from Dodd and Knight), and $2000 in punitive damages (from Dodd).

## II.

*Sufficiency of the evidence*. Maxwell claims that the jury missed the mark in ruling against her on the illegal-entry claim and that she should have won this claim as a matter of law. Yet she offers no cognizable basis for granting such relief at this stage in the case.

Parties who think there is just one reasonable way to assess the factual sufficiency of a claim—that it should succeed or fail as a matter of law—may not wait until appeal to seek relief. Generally speaking, appellate courts do not directly review the actions of juries; they review a trial judge's assessment of the work of the jury through a motion for judgment as a matter of law, allowing the trial judge who had a ring-side view of the witnesses to make a first cut on whether one side or another *must* prevail on the claim. *Young v. Langley*, 793 F.2d 792, 794 (6th Cir. 1986). In the context of a jury trial, the Federal Rules of Civil Procedure tell parties to speak up at two times if they want the court to resolve the claim as a matter of law. They must move for judgment as a matter of law before the claim goes to the jury, *see* Fed. R. Civ. P. 50(a), and they must renew the motion (or seek a new trial) after the jury issues its verdict, *see* Fed. R. Civ. P. 50(b); Fed. R. Civ. P. 59. In this case, Maxwell did neither, depriving us of any district court ruling on the issue (and most essentially of any Rule 50(b) ruling by the judge who heard the evidence) and preventing us from considering the claim in the first instance on our own. *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 400–01 (2006); *Young*, 793 F.2d at 794–95.

That the Federal Rules prohibit us from reviewing this claim, we must add, does not establish that we lack *jurisdiction* to do so, as some of our cases have suggested. Not

all mandatory rules are subject-matter jurisdictional rules. *See Pruidze v. Holder*, 632 F.3d 234, 238 (6th Cir. 2011). The term "jurisdictional" in this context applies only to those requirements that restrain "a court's adjudicatory authority"—that delineate the classes of cases and the persons who may invoke a court's decision-making power. *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. __, 130 S. Ct. 1237, 1243 (2010). When Congress passes a statute that unambiguously restricts the adjudicatory authority of the federal courts, the restriction will be treated as jurisdictional. In the Court's words: "If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515–16 (2006). Otherwise, the restriction will be treated as mandatory but not jurisdictional. Mandatory but not jurisdictional? What difference does that make? The distinction matters a great deal because the parties retain control over invoking mandatory claim-processing requirements while the courts retain control over invoking jurisdictional requirements. *Kontrick v. Ryan*, 540 U.S. 443, 456 (2004). The upshot is that a party may forfeit a mandatory claim-processing rule, but it may not forfeit (or waive) a jurisdictional limitation. *Id.*

In this instance, Article III generally gives Congress authority to decide if, when, and under what conditions federal courts may resolve cases and controversies. *Bowles v. Russell*, 551 U.S. 205, 212–13 (2007). But here there is *no statute* restricting the jurisdiction of the federal courts to entertain post-trial motions for judgment as a matter of law. What we have instead are two federal rules—Civil Rules 50(a) and 50(b)—promulgated in accordance with the Rules Enabling Act, which does not by itself give the rules jurisdictional effect. 28 U.S.C. § 2072. Those rules, to be sure, are mandatory. But in the absence of a corresponding statute they are not jurisdictional, and we cannot elide the difference. *See Reed Elsevier*, 130 S. Ct. at 1243–44; *Bowles*, 551 U.S. at 211–12. To the extent earlier decisions failed to account for this distinction, *see, e.g.*, *Allison v. City of East Lansing*, 484 F.3d 874, 876–77 (6th Cir. 2007), they are no longer good law on the point in view of recent Supreme Court authority. Today's approach is consistent with the approach of other circuits addressing the question. *See*

*Art Attacks Ink, LLC v. MGA Entm't, Inc.*, 581 F.3d 1138, 1143 (9th Cir. 2009); *Dill v. Gen. Am. Life Ins. Co.*, 525 F.3d 612, 618 (8th Cir. 2008); *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 232 (2d Cir. 2000) (per curiam).

*Unlawful entry*. Maxwell contends that the district court erred in granting judgment as a matter of law to Agent Gunnarson on the unlawful-entry claim. As the district court saw it, Gunnarson entered the home with the other agents but did not participate in the protective sweep, making it impossible to hold him liable. This analysis misses a step. An illegal-entry claim ripens when the officer *enters* the home, not when he conducts a protective sweep of the house.

The error did not prejudice Maxwell, however. Gunnarson participated in the briefing with the other agents before the arrest and had access to the same information that the jury found *justified* the other agents' entry into the home. The jury heard no evidence that would have distinguished Gunnarson's entry from the entry of the other agents. The jury considered Maxwell's unlawful-entry claim as to the other four agents and found that none of the agents violated Maxwell's constitutional rights by entering her residence. In view of this finding, the jury could not rationally have reached any other result with regard to Gunnarson. Rule 61 of the Federal Rules of Civil Procedure requires the court to "disregard all errors and defects that do not affect any party's substantial rights." *See also McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553–54 (1984). That is just the case here.

*Civil conspiracy*. Maxwell argues that the district court erred in granting judgment as a matter of law to Agents Dodd and Knight on her § 1985(3) civil-conspiracy claim. We disagree.

To establish a civil conspiracy under the statute, the claimant must show that (1) "two or more persons . . . conspire[d]" (2) "for the purpose of depriving . . . [the claimant] of the equal protection of the laws" due to racial or class-based animus and that the conspirators (3) committed an act "in furtherance of the object of such conspiracy" (4) that "injured" the claimant. 42 U.S.C. § 1985(3); *see United Bhd. of*

*Carpenters, Local 610  v. Scott*, 463 U.S. 825, 828–29 (1983).  Maxwell satisfies the third and fourth requirements.  An illegal search establishes the requisite act in furtherance of a conspiracy and the requisite injury.  But she has not shown an agreement between the officers or that the point of any potential agreement was to deprive her of equal protection of the law due to her race.  No evidence shows that Dodd and Knight agreed to do anything—other, that is, than participate in the arrest team by conducting a protective sweep of the house.  Still less is there any evidence showing that they agreed to deprive Maxwell of equal protection because of her race.

Maxwell concedes that no *direct* evidence supports the existence of a race-based conspiracy.  Yet she insists that *circumstantial* evidence creates a triable issue of fact over the issue.  She points to four circumstances that purport to establish a race-based conspiracy:  Dodd and Knight rode in the same car to Maxwell's house; they remained together during most of their time in the house; they questioned Maxwell apart from her sister; and they searched the house together, with only Maxwell accompanying them.  Circumstantial, yes; evidence of a race-based conspiracy, no.  All that these facts demonstrate is that Dodd and Knight were the two officers who searched her house, not that they *agreed* to deny her equal protection, much less that they agreed to do so on *race-based grounds*.

In the absence of an agreement, Maxwell cannot establish a conspiracy.  That the two officers allegedly spoke derogatorily to the two sisters, mentioning their race and gender, cannot by itself establish the elements of a § 1985(3) claim.  If the officers spoke impertinently to the sisters, that shows they have poor judgment, ought to receive additional training and do not yet know what it means to respect all members of the community they serve.  But the use of derogatory racial terms by itself no more proves the existence of a racially motivated *conspiracy* than the existence of a conspiracy by itself proves that it was *racially motivated*.  *See Smith v. Thornburg*, 136 F.3d 1070, 1078 (6th Cir. 1998).

Maxwell's trial testimony undermines this claim still further.  When asked if she had "[a]ny idea why [Dodd and Knight] would be dragging you from room to room to

do these things right in front of you," Maxwell answered that it was because "they had it out for Bryan." R.125 at 82. When asked if "they were doing all these horrible things to take it out on Bryan," she answered "[y]es." *Id*. at 83. Maxwell never testified that she thought the officers treated her rudely because of her race, only because they disliked her boyfriend and wanted to get at him through her. Even Maxwell's testimony, then, indicates only that if there was an agreement, it was that the officers "had it out for Bryan," not Maxwell, and if there was any animus, it was directed at Bryan, not her. That is not the kind of evidence that supports a § 1985(3) claim.

*Jury instructions*. Maxwell contends that the district court misinstructed the jury about the protective-sweep claim by omitting two relevant phrases: (1) that a protective sweep must be "cursory" and (2) that it must be "no longer than it takes to complete the arrest and depart the premises." Maxwell Br. at 9–10 (quoting *Maryland v. Buie*, 494 U.S. 325, 335–36 (1990)). This argument contains two flaws. One is that Maxwell never objected to this instruction, requiring her to run the gauntlet of plain-error review. Fed. R. Civ. P. 51(d)(2).

The other problem is that there was no error, plain or otherwise. The district court instructed the jury that a protective sweep "is not a full search of the premises" but may "extend[ ] only to those places where a person may be found." R.127 at 73. That language conveys the "cursory" nature of a protective sweep—that it is designed only to discover other individuals lurking in the house who might wish to harm the arresting officers. The court also instructed the jury that a protective sweep "may last no longer than is necessary to dispel the reasonable suspicion of danger" incident to an arrest. *Id*. That language conveys the brief duration of a legitimate protective sweep.

III.

For these reasons, we affirm.