NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**CELESTE SANTANA,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2016-2435

---

Appeal from the United States Court of Federal Claims in No. 1:14-cv-00689-NBF, Senior Judge Nancy B. Firestone.

---

Decided: November 22, 2017

---

JOHN B. WELLS, Law Office of John B. Wells, Slidell, LA, argued for plaintiff-appellant.

DOUGLAS GLENN EDELSCHICK, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by BENJAMIN C. MIZER, ROBERT E. KIRSCHMAN, JR., STEVEN J. GILLINGHAM; DAWN M. STEINBERG, Office of the Judge Advocate General, Department of the Navy, Washington Navy Yard, DC.

———————————

Before O'MALLEY, REYNA, and TARANTO, *Circuit Judges.*

O'MALLEY, *Circuit Judge.*

Celeste Santana alleges she was separated from the Navy improperly and that the Court of Federal Claims ("the Claims Court") erred when it found that it lacked jurisdiction over the bulk of Santana's claim challenging her separation. *Santana v. United States*, 127 Fed. Cl. 51, 57–62 (2016). Santana also objects to the Claims Court's entry of judgment in favor of the Navy on the limited portion of her claim over which the court did exercise jurisdiction. *Id.* at 62. For the reasons below, we find that the Claims Court correctly dismissed most of Santana's complaint. We find separately that the Claims Court should have dismissed the portion of Santana's complaint over which it exercised jurisdiction. We therefore affirm in part and vacate and remand in part with instructions to dismiss the part of Santana's complaint over which the Claims Court exercised jurisdiction.

I. BACKGROUND

A. Military Promotions

Once a naval officer reaches the rank of Lieutenant Commander, a selection board, known as a promotion board, must recommend any further promotions. *See* 10 U.S.C. §§ 611(a), 628(k). The second time a promotion board does not select an officer for promotion, the officer is typically discharged. *Id.* § 632(a). Such a discharge is considered "an involuntary retirement or discharge for purposes of any other provision of law." *Id.* § 632(b). An officer who has been passed over twice for promotion nevertheless may remain in active service if a separate selection board, called a continuation board, selects the officer to continue in active service, which the continua-

tion board may do "whenever the needs of the service require." *Id.* § 611(b).

The decisions of promotion boards and continuation boards are subject to review within the military. If the Secretary of the relevant military department finds "material unfairness" in a promotion board's decision not to select a person for promotion, the Secretary may convene a "special selection board" to determine whether the person should be recommended for promotion. *Id.* § 628(b)(1). When a continuation board decides not to retain an officer, that decision too is subject to correction by a "special board" that the Secretary may convene. *Id.* § 1558(a), (b)(1), (c).

## B. Santana's Military Service

Santana served on active duty in the Navy for seventeen years until her honorable discharge in 2011. *Santana*, 127 Fed. Cl. at 55. Santana was appointed to Lieutenant Commander in 2004. In March 2009, a selection board considered Santana for promotion to Commander. *Id.* The 2009 selection board considered Santana's two most recent fitness reports—performance evaluations that were part of Santana's military record—from December 2007 and August 2008. *Id.* Both fitness reports evaluated her as "promotable," the third of five possible grades, below the higher grades of "must promote" or "early promote." *Id.* Her grades put Santana in the bottom half of her peer group. *Id.* The March 2009 selection board did not recommend Santana for promotion. *Id.*

In mid-2009, Santana was deployed to Afghanistan, where she served as an environmental health officer on Marine Corps bases and reported directly to a Marine Corps colonel. Santana alleges that she discovered and complained about several serious health deficiencies at some of the bases where she served, including violations of burn pit regulations and improper storage of water

bottles, but her complaints were ignored. *Id.* at 54. In late October 2009, Santana was redeployed back to the United States. At the time, Santana's records indicated that she had been "detached"—that is, sent back to the United States from her deployment—"due to loss of confidence and ability to perform assigned duties." J.A. 90.

In November 2009, "on [the] occasion" of her detachment, Santana received a fitness report from the Marine Corps colonel to whom she reported in Afghanistan. J.A. 89–90. This fitness report evaluated Santana's performance from May 1, 2009 until November 2, 2009. The fitness report recognized her "[t]echnical acumen," but it nevertheless gave Santana a grade of "significant problems" and said that she "[l]ack[ed] ability to establish cooperative working environment," that her "[m]ission accomplishment and initiative skills [were] lacking," and that she "[l]ack[ed] ability to motivate or lead subordinates towards accomplishing goals." *Id.*

Santana received two other fitness reports in early 2010, both of which raised concerns with aspects of her performance. *Santana*, 127 Fed. Cl. at 55. The first was signed in January 2010 by a naval officer who evaluated Santana's performance from August 15, 2008, until October 31, 2009, a period which included her deployment in Afghanistan. *Id.* at 55–56. That fitness report graded Santana "promotable"—again in the bottom half of her peers. *Id.* It noted that Santana's "inability to establish mutually beneficial working relationships with those both senior and junior to her has impaired her effectiveness." *Id.* The second fitness report was signed in February 2010 by the same naval officer and evaluated Santana's performance after her return to the United States, from November 1, 2009, until February 28, 2010. *Id.* at 55. The February 2010 fitness report graded Santana as having "significant problems" and was overwhelmingly negative. *Id.* at 56.

In March 2010, a selection board for the second time considered Santana for promotion to Commander. *Id.* at 55. The selection board considered Santana's fitness reports from December 2007 and August 2008; the three subsequent fitness reports, from November 2009, January 2010, and February 2010; and other documents that Santana had submitted. *Id.* The 2010 selection board did not select Santana for promotion. *Id.* at 55–56. Santana did not ask the Secretary to convene a special selection board to review the fairness of that decision.

After Santana was not selected for promotion for the second time, a continuation board convened to decide whether she could continue her active duty service. *Id.* at 56. The continuation board had before it the same documents that the 2009 and 2010 promotion boards considered, including the fitness reports discussed above. *Id.* The continuation board did not recommend Santana for continuation, and Santana was honorably discharged. *Id.*

## C. Procedural History

In December 2009, Santana filed a whistleblower complaint with the Office of the Inspector General of the Department of Defense ("DoD IG") pursuant to the Military Whistleblower Protection Act ("MWPA") alleging that the negative November 2009 fitness report was retaliation for her protected communications about the environmental hazards she had found in Afghanistan. *Santana*, 127 Fed. Cl. at 55. The DoD IG determined that there was "insufficient evidence of reprisal to warrant further inquiry" and closed Santana's case in July 2010. *Id.* The DoD IG found that Santana had been detached from her deployment in Afghanistan "due to substandard performance and received an adverse Fitness Report accordingly." *Id.* The DoD IG informed Santana that she could petition the Board for Correction of Naval Records ("BCNR") to seek further consideration of the matter. *Id.*

After her discharge took effect in January 2011, Santana petitioned the BCNR for relief, arguing that the discharge was a "wrongful separation" because she "was unjustly denied continuation on [active duty] despite needing less than three years to reach retirement eligibility." J.A. 167. Santana asked to be reinstated without any break in service and for a special board to revisit the continuation board's decision. In March 2012, however, Santana withdrew her petition, citing a lack of "confidence in the BCNR's ability or willingness to properly correct injustice." J.A. 103. The BCNR administratively closed Santana's case.

In March 2014, Santana sent a letter through her counsel to the Secretary of the Navy ("the Secretary"), again asking that she be retroactively restored to active duty and that her military record be corrected. The letter reiterated Santana's belief that "any attempt to seek relief from the [BCNR] would be futile." J.A. 118. The Secretary forwarded the letter to the Navy's Office of the Judge Advocate General ("Navy JAG"), which responded by directing Santana to the BCNR. Santana again declined to seek relief through the BCNR, and the Navy JAG informed Santana that he would not forward the request directly to the Secretary. J.A. 112–15.

In August 2014, Santana filed a complaint in the Court of Federal Claims pursuant to the Military Pay Act ("MPA"). Complaint, *Santana v. United States*, 127 Fed. Cl. 51, ECF No. 1. The complaint alleged that the November 2009 fitness report was "in reprisal for her failure to cover up the environmental health problems [in Afghanistan] and for her reports of those health and safety issues outside of the chain of command." *Id.* at ¶ 124; *see also id.* at ¶¶ 4, 118–125. Santana claimed that the fitness report, as well as other actions—most importantly the detachment from her deployment in Afghanistan and her separation from active duty—were arbitrary and capricious and violated her rights under the First

Amendment, military regulations, and Department of Defense directives implementing the MWPA. *Id.* at ¶¶ 170–188. These actions, Santana claimed, negatively impacted her chances for promotion and ultimately resulted in her termination. While her action before the Claims Court was pending, Santana filed a request with the Secretary, again asking that a special board be convened to review the March 2010 decision of the continuation board. *Santana*, 127 Fed. Cl. at 56.

Santana's complaint also alleged that the November 2009 fitness report "indicat[ed] she was detached for cause" from her deployment in Afghanistan, but that the purported detachment for cause did not satisfy applicable military regulations. Complaint at ¶¶ 118–124.[1] Santana further alleged that this detachment for cause was, like the November 2009 fitness report, "in reprisal for" her whistleblowing activities. *Id.* at ¶ 124.

To remedy these violations, Santana sought reinstatement to active duty at her previous rank, effective

---

[1] A detachment for cause "is the administrative removal of an officer . . . from the officer's current duty assignment before their normal transfer or planned rotation date." United States Navy, Military Personnel Manual (MILPERSMAN) 1611-020, Officer Detachment for Cause (Mar. 30, 2007). It "is one of the strongest administrative measures used in the case of officers" and "has a serious effect on the officer's future naval career, particularly with regard to promotion, duty assignment, selection for schools, and special assignment." *Id.* Military regulations therefore lay out a number of steps to be taken before a detachment for cause request is initiated, including "[c]ommand counseling, guidance, training, and appropriate use of fitness reports," a "formal written notification to the officer" soliciting the officer's response, and a letter to Naval Personnel Command. *Id.*

the date of her discharge, with all back pay and allowances. *Id.* at 30–31. Santana also asked the Claims Court to remove from her military record the adverse fitness reports and all references to her detachment for cause and the failure to select her for promotion. *Id.* Santana additionally sought a special selection board. *Id.* at 30.

In June 2016, the Claims Court dismissed most of Santana's claim for lack of jurisdiction. *Santana*, 127 Fed. Cl. at 53–55. The court noted that the MWPA sets forth "a fairly elaborate administrative process" for handling whistleblower complaints and that the Claims Court had no jurisdiction over MWPA claims. *Id.* at 57–58 (quoting *Klingenschmitt v. United States*, 119 Fed. Cl. 163, 185 (2014)). Relying on its own precedent in *Klingenschmitt* and other persuasive authority, the court held that it similarly lacked jurisdiction over "a whistleblower claim under the guise of a Military Pay Act claim." *Id.* at 59.

The Claims Court also found that it lacked jurisdiction over Santana's challenges to the decisions of the selection and continuation boards because she had failed to exhaust mandatory administrative remedies. *Id.* at 59–62. Because Santana's most recent request for a special board to review the continuation board decision was still pending, the court held that it could not yet review the merits of the continuation board's decision. *Id.* at 61–62.

Although the court found that it lacked jurisdiction over Santana's non-promotion and continuation claims, it construed Santana's complaint to raise a separate claim that the January 2010 fitness report was effectively a detachment for cause for which the Navy did not follow proper procedures. *Id.* at 62. The court held that it did have jurisdiction over this claim, but nevertheless rejected Santana's contention on the merits. *Id.* The court found that "the January 2010 fitness report did not oper-

ate as a" detachment for cause because Santana was not discharged until after the selection board and continuation board had reviewed her fitness reports in March 2010. *Id.* The court granted the government's motion for judgment on the administrative record with respect to this claim. *Id.*

This appeal followed. The parties dispute whether the Claims Court had jurisdiction over Santana's complaint, but we have jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(3).

## II. DISCUSSION

The Claims Court found that it lacked jurisdiction over Santana's claim that the Navy retaliated against her by deciding not to promote or retain her on active duty. But the court found that it did have jurisdiction over Santana's claim that there were procedural defects in her alleged detachment for cause before the court granted judgment on the administrative record to the United States.

"Decisions dismissing a complaint and interpretations of statutes by the Court of Federal Claims are questions of law and reviewed by this court de novo." *Ainslie v. United States*, 355 F.3d 1371, 1373 (Fed. Cir. 2004) (citations omitted). We also review *de novo* whether the Claims Court possesses jurisdiction over a claim. *Navajo Nation v. United States*, 631 F.3d 1268, 1272 (Fed. Cir. 2011) (citing *W. Co. v. United States*, 323 F.3d 1024, 1029 (Fed. Cir. 2003)). We consider separately the portion of Santana's claim regarding the decisions of the promotion and continuation boards and the portion regarding the alleged detachment for cause.

### A. Promotion and Continuation Decisions

As discussed above, the 2010 continuation board convened under 10 U.S.C. § 611(b). When a continuation board decides not to retain an officer, that decision is

subject to correction by a "special board" that the Secretary may convene. 10 U.S.C. § 1558(a), (b)(1), (c). "A person seeking to challenge an action or recommendation of a selection board . . . is not entitled to relief in any judicial proceeding unless the action or recommendation has first been considered by a special board under this section or the Secretary concerned has denied the convening of such a board for such consideration." *Id.* § 1558(f)(1). On the other hand, the decision of a special board, or the Secretary's determination not to convene a special board, is subject to judicial review. *Id.* § 1558(f)(2)–(3). In other words, § 1558(f) bars a member of the military from seeking judicial relief from the decision of a continuation board until the Secretary has convened a special board to review the decision or has decided not to convene one.

The Claims Court correctly found that this provision precluded it from reviewing Santana's claims. Santana argues that, because she brought her claim under the MPA, she objects only to the deprivation of pay, not the decision of the continuation board. But the primary remedies Santana sought—retroactive reinstatement to active service and back pay—require an implicit determination that the continuation board was incorrect when it recommended her separation. Santana, in effect, seeks to overturn the decision of the continuation board. Santana therefore was "[a] person seeking to challenge an action or recommendation" of a continuation board "in [a] judicial proceeding" within the meaning of § 1558(f)(1). Section 1558 barred Santana's claim until she exhausted administrative remedies.[2]

---

[2]    10 U.S.C. § 628(h)(1) precludes judicial review of a "claim based to any extent on the failure of a person to be selected for promotion by a promotion board" unless "the person has first been referred by the Secretary concerned

Notably, the Claims Court held that, "under . . . § 1558, the court *lacks jurisdiction* to review the decision of a . . . continuation board unless the decision is first considered by a special selection board." *Santana*, 127 Fed. Cl. at 60 (emphasis added). The Claims Court and at least two federal district courts have held that the exhaustion requirement of § 1558 is jurisdictional. *See Crumley v. United States*, 122 Fed. Cl. 803, 805 (2015) (interpreting § 1558 to provide that "this court is without jurisdiction to review a decision of a 'selection board' if the individual has not first sought review by a 'special board'"); *In re Navy Chaplaincy*, 850 F. Supp. 2d 86, 102–04 (D.D.C. 2012) (finding that § 1558(f) "limits a court's jurisdiction over those actions . . . that seek judicial review of a decision or recommendation" by a continuation board); *Byrum v. Winter*, 783 F. Supp. 2d 117, 123–25 (D.D.C. 2011) (dismissing a complaint for lack of subject matter jurisdiction where a plaintiff had failed to satisfy the exhaustion requirements of § 1558(f)); *Cotrich v. Nicholson*, No. 6:06-cv-1772, 2006 WL 3842112, at \*2–3 (Dec. 19, 2006) (same). Santana does not object to the Claims Court's characterization of § 1558 as jurisdictional.

A statute is jurisdictional in character only when "the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515–16 (2006). The Supreme Court has cautioned against "mischaracteriz[ing] claim-

---

to a special selection board convened under this section." The United States argues that this provision also bars review of Santana's claim. The Claims Court did not decide this issue because it found that § 1558 barred Santana's claim. *Santana*, 127 Fed. Cl. at 61. While the government's argument appears well-taken, we choose not to reach it for the first time on appeal.

processing rules or elements of a cause of action as juris-dictional limitations." *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161 (2010). The distinction is important; jurisdictional defects are not subject to waiver, forfeiture, or equitable tolling, and may be raised at any time, whereas claim-processing rules may be waived, forfeited, or extended when appropriate. *Hamer v. Neighborhood Hous. Servs. of Chi.*, No. 16-658, slip op. at 2–3 (Nov. 8, 2017) (citations omitted).

We do not decide here whether § 1558(f) poses a juris-dictional bar to Santana's claim. Even if the exhaustion of administrative remedies is not a jurisdictional prereq-uisite, it is clearly an element of Santana's claim. Her failure to assert that she has complied with that require-ment is, thus, a defect in her claim that renders it inade-quate. Other than her reference to "futility"—which we discuss below—Santana has not argued that the Navy waived the requirements of § 1558(f), or that those re-quirements should be forgiven. Indeed, Santana knew of the obligation to seek administrative review as part of the § 1558 process, but affirmatively chose not to take that mandatory step. She did so even though the Navy invited her to seek review by the BCNR, which could have cor-rected her military record and recommended the conven-ing of a special board to revisit the continuation board's decision. 10 U.S.C. § 1552; *id.* § 1558(a), (b)(1)(B), (c). Thus, even if the Claims Court could have exercised jurisdiction over Santana's primary claim, it would have had to dismiss that claim since Santana did not assert—and concedes she could not assert—that she exhausted her administrative remedies. A remand so that the Claims Court can re-characterize the basis for dismissal would, thus, be an unnecessary exercise. We hold only that the Claims Court correctly dismissed Santana's claim for her failure to exhaust applicable administrative reme-dies.

Citing our decision in *Martinez v. United States*, 333 F.3d 1295 (Fed. Cir. 2003) (en banc), Santana argues that exhaustion is not required for claims under the MPA. *Martinez* does not stand for that broad proposition. We held in *Martinez* that a cause of action for wrongful discharge immediately accrues upon the discharge. *Id.* at 1304. We rejected the argument that the claim does not accrue until the service member has exhausted administrative remedies. *Id.* In *Martinez*, however, we contemplated a statutory scheme with "a permissive administrative remedy," which "a plaintiff is not required to exhaust . . . before bringing suit." *Id.* We observed that, by contrast, "if a dispute is subject to mandatory administrative proceedings, the plaintiff's claim does not accrue until the conclusion of those proceedings." *Id.* (citations omitted). Santana does not dispute that the administrative procedure described in § 1558 is mandatory with respect to judicial review of continuation board decisions. *Martinez* therefore does not govern this case.

Santana also complains that it would have been futile for her to seek review in the BCNR. The cases that Santana cites for this futility argument do not support a finding of futility in these circumstances, however. They suggest only that the exhaustion requirement "does not include the performance of clearly useless acts." *Baxter v. Claytor*, 652 F.2d 181, 185 (D.C. Cir. 1981); *see also McNeese v. Bd. of Educ. for Cmty. Unit Sch. Dist. 187*, 373 U.S. 668, 674–76 (1963) (declining to require exhaustion of a state administrative procedure that could not have remedied the alleged constitutional violation). As discussed above, Santana could have obtained complete relief through the BCNR, which could have initiated the special board procedure set forth in § 1558. Santana's belief that the BCNR and the special boards would not have been receptive to her claims does not render the available administrative remedies "clearly useless" or otherwise excuse the statutory exhaustion requirement.

*See Gilmore v. Weatherford*, 694 F.3d 1160, 1169 (10th Cir. 2012) (requiring individuals to seek administrative relief "even when the agency is unlikely to grant the relief requested"); *UDC Chairs Chapter, Am. Ass'n of Univ. Professors v. Bd. of Trustees of Univ. of D.C.*, 56 F.3d 1469, 1475 (D.C. Cir. 1995) ("The mere probability of administrative denial of the relief requested does not excuse failure to pursue administrative remedies; rather, plaintiffs must show that it is certain that their claim will be denied." (internal quotation marks omitted)).

Santana observes finally that, after the Claims Court issued its decision, the Secretary denied her request for a special board under § 1558. ECF No. 42. She therefore urges us to deem the exhaustion requirement satisfied. But when Santana filed her complaint and when the Claims Court dismissed it, she had not met the prerequisites for review in the Claims Court.[3] That court therefore correctly dismissed Santana's claim.[4]

## B.  Detachment for Cause

The Claims Court found that it had jurisdiction over Santana's claim regarding her alleged detachment for cause, but it found for the United States on the merits. *Santana*, 127 Fed. Cl. at 62. The court characterized

---

[3]    Santana has filed a second case before the Claims Court that, she alleges, does not suffer from this defect—*i.e.*, that all administrative remedies relating to her claim have been exhausted. Complaint, *Santana v. United States*, No. 16-1703 (Fed. Cl. Dec. 28, 2016), ECF No. 1. The Claims Court stayed the second case pending our decision in this appeal. Order, *Santana v. United States*, No. 16-1703 (Fed. Cl. Jan. 5, 2017), ECF No. 7.

[4]    We do not reach the Claims Court's holding that it lacked jurisdiction because Santana's claims fell under the MWPA. *Santana*, 127 Fed. Cl. at 57–59.

Santana's complaint as "argu[ing] that the January 2010 fitness report was in effect a detachment for cause ('DFC') and that the Navy did not follow proper procedures for issuing a DFC." *Id.*[5] The court held "that the January 2010 fitness report did not operate as a DFC" and therefore rejected her objection on this basis. *Id.*

Santana argues that the court misunderstood her claim. Santana alleged in her complaint that her detachment from her unit in Afghanistan was a detachment for cause and that it violated the applicable military regulations by failing to accord her the procedural protections that should have accompanied such a detachment. Complaint at ¶¶ 118–124. To support this allegation, Santana cited the November 2009 fitness report, which indicated that it was "[s]ubmitted on occasion of [Santana's] detachment due to loss of confidence and ability to perform assigned duties." J.A. 90. Santana argues that the phrasing of this fitness report demonstrates that her detachment from her deployment in Afghanistan was, in actuality, a detachment for cause. Santana explains that, contrary to the interpretation by the Claims Court, this part of her complaint had nothing to do with the January 2010 fitness report or her eventual separation.

Regardless of how Santana characterizes her claim, the Claims Court could not grant her relief. The only evidence Santana cites to support her claim that she was detached for cause is the November 2009 fitness report.

---

[5] The Claims Court also referred to "Santana's allegations that her *separation* was a detachment for cause." *Santana*, 127 Fed. Cl. at 55, 62 (emphasis added). Santana points out the distinction between her separation—her discharge from active service—and her detachment from her posting in Afghanistan. The court's actual analysis, however, focused on the fitness report and not Santana's eventual separation from the Navy. *See id.* at 62.

Santana identifies no harm flowing from the alleged detachment for cause other than the effect on her service record and her eventual separation, and she seeks no remedy aside from the correction of the offending fitness report and reinstatement. Santana's claim challenging her alleged detachment for cause therefore is subsumed within her claim challenging her separation. The Claims Court correctly determined that the exhaustion requirement precluded the latter claim, and Santana failed to state a claim for relief on the former. We therefore vacate the judgment of the Claims Court and remand with instructions to dismiss this portion of Santana's claim. *See Navajo Nation*, 631 F.3d at 1269.

## III. CONCLUSION

For the foregoing reasons, we affirm in part and vacate and remand in part. We affirm the Claims Court's dismissal of the portion of Santana's claim related to the Navy's non-promotion and continuation decisions. We vacate and remand to the Claims Court with instructions to dismiss the portion of Santana's claim related to the alleged detachment for cause.

**AFFIRMED IN PART, VACATED AND
REMANDED IN PART**